25 C.C.P.A. (Customs)

# UNITED STATES v. PILLSBURY FLOUR MILLS CO.*

### Customs Appeals No. 4115.

Court of Customs and Patent Appeals.

Feb. 7, 1938.

Charles D. Lawrence, Acting Asst. Atty. Gen., for the United States.

James L. Gerry, of New York City, amicus curiæ.

Clark Hempstead, of Minneapolis, Minn., for appellee.

Barnes, Richardson & Colburn, of New York City (Samuel M. Richardson, of New York City, of counsel), amicus curiæ.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from a judgment of the United States Customs Court, Third Division, sustaining importer's protest and awarding the refund of certain duties assessed and collected by the collector of customs at the port of Buffalo, N. Y., as hereinafter particularized.

The importer, appellee here, imported certain wheat from Canada during the period from October 2, 1931, to August 12, 1932, and placed it in a bonded warehouse under the provisions of section 311 of the Tariff Act of 1930, 19 U.S.C.A. § 1311. It was afterwards, from time to time, processed into flour and the flour exported to Cuba. The consumption entry here involved, dated September 29, 1932, was liquidated April 25, 1934. By reason of article 4, schedule B, of the Commercial Reciprocity Treaty between the United States and Cuba, of December 11, 1902, 33 Stat. 2136, the flour, being a product of the industry of the United States, was admitted into Cuba at a reduction of 30 per centum of the basic rate of duty provided thereon by Cuban law, and so it became sub-

*Writ of certiorari denied 58 S.Ct. 1056, 82 L.Ed. ——.

ject to the following provision of section 311 of the Tariff Act of 1930:

"No flour, manufactured in a bonded manufacturing warehouse from wheat imported after ninety days after the date of the enactment of this Act [June 17, 1930], shall be withdrawn from such warehouse for exportation without payment of a duty on such imported wheat equal to any reduction in duty which by treaty will apply in respect of such flour in the country to which it is to be exported."

The collector assessed duty at the rate of 39 cents per 100 kilos under the above provision and that assessment is not in dispute.

That which is in dispute is an additional assessment of fifteen-hundredths of 1 cent per Spanish pound upon the wheat in question made by the collector under the following circumstances:

An act of the Cuban Congress of July 29, 1932, provided, so far as here pertinent, as follows:

"Article I. An internal consumption tax of one-half cent on every pound of wheat flour imported into the national territory is hereby created.

"Article II. This tax is created as an urgent measure to assure the protection of vital economic and financial interests of the Republic, and whatever may be collected on this account shall be deposited in the Treasury of the Republic for the Public Revenues Fund."

On August 4, 1932, the Secretary of the Treasury of Cuba in "Decree No. 263" issued the following instructions relative to the tax so created:

"First. This tax of one-half centavo upon each pound of wheat flour shall be paid in the custom houses, conjunctly with the import duties.

"Second. The Law shall come into force on the fifth day of August of the present year and the Administrators [Collectors] of Customs shall make this tax effective from that day.

"Third. The returns from this tax shall be converted into the general fund of the Public Revenues and shall be shown separately from customs duties in the accounts of the Customs Administrators [Collectors].

"Fourth. The appeals which may be presented by parties affected by this tax shall be heard before the Section of the One and one-half percent and Sundry Taxes of the Internal Revenues Administration in accordance with the Laws in force.

"Circulate this to the Administrators [Collectors] of Customs.

"The Director of Internal Revenue is charged with the enforcement of the provisions hereof."

At some time following the passage of the Cuban Act the United States Ambassador to Cuba made representations to that Government which led to the promulgation by the President of Cuba of a proclamation in which it was declared that, in view of the interpretation of the Cuban Act of July 29, 1932, in the light of the Cuban Reciprocity Treaty of 1902, by the State Department of Cuba, it was "proper to grant the benefit or discount of thirty percent * * * in the tax on wheat flour created by the Law of July 29th last * * * when it may be the product of the soil or of the industry of the United States." The proclamation was dated September 2, 1932, and was made applicable to imports (into Cuba from the United States) made after July 29, 1932, the date of the passage of the Cuban law.[1]

---

[1] The full text of the proclamation as translated reads as follows:

Decree No. 1249.

Whereas: By a law of the Republic, of July 29, 1932, published in the Official Gazette of August 1st of the same year, there was established an internal consumption tax of one-half of one cent on every pound of wheat flour imported into the national territory.

Whereas: The Government of the United States, through its Ambassador accredited before our Government, has made representations to our Foreign Office in the sense that it is proper to apply to said tax the benefit of the thirty percent, which article four of the Treaty of Commercial Reciprocity signed by Cuba and the United States on December 11, 1902, recognizes in favor of the flour imported from that country.

Whereas: It being a matter of the interpretation of an international treaty, the Treasury Department, before deciding upon the question brought up by the Government of the United States, requested the opinion of the Department of State of the Republic, which the latter gave in the sense that it was proper to accede to the demand mentioned above,

On February 17, 1933, the Acting Commissioner of Customs of the United States issued T.D. 46207, 63 Treas.Dec. 379, approved by the Secretary of the Treasury, in which instructions were given to levy, in addition to the 30 per centum above described as being provided in the treaty, an additional duty of 30 per centum of one-half cent (fifteen-hundredths of 1 cent) on the imported wheat from which the flour exported to Cuba was manufactured, the same to be levied on all withdrawals made on and after September 7, 1932. Subsequently, T.D. 46207 was amended by T.D. 46625, 64 Treas.Dec. 227, of September 16, 1933, in ways not here material. Such duty was levied upon the importation here involved and it constitutes the only matter which is the subject of protest. The amount involved was calculated to be $292.67.

The trial court, after quoting from the protest, states appellee's contentions as follows:

"In support of this claim plaintiff submits some seventeen or eighteen separate propositions which he asserts are established by the evidence introduced, the legal effect of which, briefly summated, is as follows:

"The internal consumption tax enacted by the Cuban Congress (Exhibit G–2) attached to the merchandise in question after importation, and therefore said tax was not a customs tariff within the contemplation of the language used in article IV 'of the Reciprocity Treaty between the United States and Cuba of 1902, which provides that certain commodities shall be admitted 'at the following respective reductions of rates of duty thereon as now provided or as may hereafter be provided in the *customs tariff of the Republic of Cuba.*' Further, that being an internal consumption tax and not one provided by the customs tariff of the Republic of Cuba it was not proper for Cuba to have granted the reduction provided by the Reciprocity Treaty between the United States and Cuba, viz, 30 per centum of the internal consumption tax upon wheat flour imported from the United States. Further, that the reduction of 30 per centum awarded by Cuba on the rate of this internal consumption tax upon flour imported from the United States, to wit, 30 per centum of one-half cent per Spanish pound, not being a reduction provided for in the Reciprocity Treaty, was not required to be paid under the provisions of section 311, supra." [Italics quoted.]

The foregoing comprehends most of the contentions which appellee made before us. There was here some argument in which counsel for appellee discussed, we suppose for the purpose of illustration only, the reciprocal trade agreement with Cuba of August 1934. Since the transaction here involved was prior to that agreement we fail to see wherein the latter can have the slightest bearing upon the issue, and no further attention need be given it.

---

because the point of view of the Embassy of the United States is perfectly in accord with the Treaty of Reciprocity.

Whereas: Every international Treaty entered into in accordance with the laws of the Republic, binds the latter in the terms therein contained with the force of law and the Government of the Republic has the right, when proper, to interpret it in good faith and to require its exact fulfillment to safeguard the good credit of the Nation, ordering its execution as that of a law not repealed by another more recent.

Therefore: In use of the powers granted me by the Constitution and the Laws, on the proposal of the Secretary of the Treasury and after hearing the favorable opinion of the Secretary of State.

I Resolve

First. That it is proper to grant the benefit or discount of thirty percent, recognized by article four of the Treaty of Commercial Reciprocity entered into between Cuba and the United States, in the tax on wheat flour created by the Law of July 29th last, published in the Official Gazette of August 1st of the same year, when it may be the product of the soil or of the industry of the United States.

Second. This Decree shall take effect on the date of its publication in the Official Gazette, and it shall be applied to the future imports of wheat flour originating from the soil or from the industry of the United States, as well as to the imports made after the law of August* 29, 1932, went into effect.

The Secretary of the Treasury is entrusted with carrying out what is provided in the present Decree.

Given at the Presidential Palace, in Habana, the second day of September, 1932.

Gerardo Machado,
President.

Mario Ruiz Mesa,
Secretary of the Treasury.

* Should read "July."

The contention before us on the part of the Government is, in substance, the same as that made before the trial court. It may be summed up as follows: That the internal consumption tax provided by the law of Cuba was imposed upon wheat flour "conjunctly with the import duties" and was, therefore, in contemplation of law a customs duty; that so to treat it does not offend the terms of the Cuban Treaty of 1902; that a treaty is in essence a contract and in this case subject to the interpretation placed upon it by the executive and administrative departments of the contracting nations; that it has been interpreted by such authorities of both Goverments "in the sense that it is proper to apply to said tax the benefit of the thirty per cent [reduction]" provided in article 4 of the treaty of 1902; that the said tax has not only been recognized by the contracting parties as in the nature of a customs duty, but that the administrative officers of Cuba have, since the effective date of the law, consistently applied the fifteen-hundredths of 1 cent reduction; that no disputes have arisen between the taxpayers in Cuba and the Cuban Government resulting in litigation over the interpretation; that there is no dispute as to the amount of the tax resulting from the collector's assessment of the fifteen-hundredths of 1 cent per Spanish pound, and it is urged that, in view of this state of facts, the "other questions presented by the protest of the importer are political rather than judicial and, therefore, not justiciable."

The briefs in the case are quite extensive. By permission of the court, amicus curiæ appeared on each side and filed briefs. Numerous authorities are cited on various points, not all of which require review here. The authority principally relied upon by the trial court was our decision in the case of Faber, Coe & Gregg, Inc., v. United States, 19 C.C.P.A., Customs, 8, T.D. 44851.

That case involved certain cigars imported from Cuba in November 1927, while the Tariff Act of 1922, 42 Stat. 858, was in force. The collector assessed the regular duty imposed as a tariff duty by the tariff act with a reduction of 20 per centum allowed by reason of the Cuban Reciprocity Treaty of 1902, specifically recognized by section 316 of the tariff act, 19 U.S.C.A. § 1316. In the meantime there had been passed the Revenue Act of 1926 which provided, among other things, for a tax upon domestically manufactured cigars and provided further for an equivalent tax on imported cigars. In both instances provision was made that stamps, procured from the collector of internal revenue, should be affixed in payment of the internal revenue tax, and, in the case of imported cigars, it was required that the stamps be affixed and cancelled while the cigars were in the custody of the proper "customhouse officers," the act saying they " * * * shall not pass out of the custody of such officers until the stamps have been so affixed and cancelled." 26 U.S.C.A. § 830(b).

Stamps for the full amount of the internal-revenue tax were affixed to the imported cigars there involved and cancelled, no reduction being allowed. The claim of the importer was that by reason of the Cuban Reciprocity Treaty of 1902 there should have been an allowance of 20 per centum reduction in the so-called internal-revenue tax, as well as in the regular customs duty where the allowance was made.

One of the contentions of the Government in the case was that the Customs Court, and hence this court, had no jurisdiction of the matter raised by the protest and that the action, therefore, should be dismissed. This contention we overruled, thus sustaining the trial court upon that point. We held after citing numerous authorities that the internal-revenue taxes imposed on the imported cigars, "although additional to and separate from the regular or primary duties provided by the Tariff Act of 1922, are, nevertheless, as applied to imported merchandise, customs duties, as held by the Supreme Court and this court in the cases hereinbefore cited," and that protests concerning them were within the jurisdiction of the Customs Court, and of this court upon appeal. The several obligations imposed upon the collector of customs, with respect to the so-called internal-revenue taxes and the imported merchandise upon which such taxes were levied, were pointed out in our opinion.

Upon the merits, however, we reversed the trial court, saying:

"In view of the fact that, generally, customs duties become a lien on imported merchandise at the moment of its arrival within the limits of a port of entry, and, as taxes imposed on imported merchandise, while it retains its 'distinctive character' as an import, are customs duties, regardless

of whether they are imposed at the time of importation or subsequent thereto, it is obvious that the contracting parties intended to distinguish between the regular tariff duties (made preferential in respect to all like imports from other countries, Articles 2 and 8) and other additional taxes, including additional customs duties, imposed on *imported merchandise subsequent to its importation and prior to its entering into consumption* (required by Article 9 to be 'imposed and collected without discrimination upon like articles whencesoever imported'), and to provide that, as to the regular tariff duties, the rates therein provided should continue preferential in respect to all like imports from other countries, whereas the additional taxes, including additional customs duties, should be imposed and collected *without discrimination* upon like articles whencesoever imported.

"Accordingly, we are of opinion that appellant is not entitled to a reduction of 20 per centum of the additional customs duties imposed by U.S.C., title 26, section 845, [26 U.S.C.A. §§ 830(b), 881], and section 400 of the Revenue Act of 1926, U.S.C., title 26, section 832, supra, [26 U.S.C.A. §§ 700(c), 701(a)], and we so hold."

It may be said that petition for writ of certiorari was denied by the Supreme Court without opinion. Faber, Coe & Gregg, Inc., v. United States, 284 U.S. 634, 52 S.Ct. 18, 76 L.Ed. 539.

The following differences between the Faber, Coe & Gregg, Inc., Case, supra, and that at bar are noted:

First, in the former case the Government of the United States imposed an internal-revenue tax on all cigars, whether they were *domestically manufactured* or *imported;* in the present case the Cuban Government imposed an internal consumption tax upon only *imported* wheat flour.[2]

Second, the internal-revenue tax imposed by the United States upon imported cigars by the Revenue Act of 1926 was not paid to the United States collectors of customs, but the importer purchased stamps from the United States collectors of internal revenue, paying them therefor, and affixed such stamps to the cigars while they were in customs custody; in the case of the flour imported into Cuba the internal consumption tax was paid "exclusively in cash * * * at the office of the Collector of Customs, at the Department set aside for that purpose, in which a voucher or receipt is [was] issued for the payment that is [was] made." The tax was paid before the flour left customs custody; hence, of course, before it entered into consumption (except in cases of stocks which were on hand that had been withdrawn from customs custody at the time of the passage of the act, a matter of no concern here).

It seems perfectly clear that the Cuban law, if construed by the rules followed by this court in the Faber, Coe & Gregg, Inc., Case, supra, would result in the taxes imposed by it being treated as customs duties. To that extent we agree with the decision of the Customs Court.

Whether the differences in the facts and in the language used in our Revenue Act of 1926 and the Cuban Act would lead, were the Cuban Act a United States law, to a decision different from that in the Faber, Coe & Gregg, Inc., Case, supra with respect to the allowance of fifteen-hundredths of 1 cent reduction by reason of the provisions of the Reciprocal Treaty of 1902, is a question which, under the view we take of this case, requires no determination or discussion.

Conceding that the decision upon that point would be the same were we construing a United States statute and the treaty in pari materia, as we did there, we are of the opinion that the trial court erred in not accepting the construction adopted by the Cuban Government. The opinion of the Customs Court at one point states:

"It would seem from statements in the Government brief that counsel for the Government is contending that the United States, as a party to the treaty, is empowered to construe a law of a foreign country. With this we cannot agree. Nor have we any judicial decisions of the Republic of Cuba, interpreting the said law, to guide us in this matter." 71 Treas.Dec. 876.

Notwithstanding the foregoing, it seems clear enough that the Customs Court did construe the Cuban law, and construed it in a manner different from the construction given it by the Cuban Government.

The brief and oral argument on behalf of appellee before us again and again at-

---

[2] It was stated during oral argument of the case before us that Cuba produces no wheat and manufactures no flour, and it is our impression that substantially all the flour used in that country is imported from the United States.

tacks the correctness of the construction of the Cuban act and the treaty stated by the President of Cuba, acting after being advised by the Department of State of Cuba whose official advice was sought by that country's Treasury Department, and this court is asked by appellee to follow the Customs Court and overrule that interpretation.

Obviously, the courts of this country have no control over decisions of the tribunals of a foreign country in the interpretation of their laws. Upon the contrary, by all the rules of international courtesy and comity, the courts of this country are bound in a judicial proceeding such as this to follow the interpretations of such tribunals so far as they apply to *their own laws and conditions.* If interests of citizens of our own country are so affected by such interpretations as to justify the interposition of our Government, such intervention, we think, must be by the proper political department. ·

We do not overlook the line of decisions by our Supreme Court, cited by the trial court in its opinion, to the effect that the construction of treaties by the political department of our Government is not conclusive or binding upon the courts of our country. That rule, however, has no application to the instant case. We do not have here the construction merely of a treaty. We have before us a law of a foreign country which that country's high officials have construed in the light of a treaty to which we are a party. It may be remarked that that construction as a matter of fact is favorable to all our domestic producers of flour for export to Cuba, except where such flour is manufactured from imported wheat, but were it otherwise we should still feel that it would present a situation not susceptible of correction by our courts.

The trial court quotes from Elmendorf v. Taylor, 23 U.S. 152, 10 Wheat. 152, 6 L.Ed. 289, the following: "The courts of every government have the *exclusive* authority of construing its local statutes, and their construction will be respected in every other country." [Italics by the Customs Court.]

Following this, the Customs Court says: "Had the court of Cuba interpreted this statute we would have accepted such interpretation as true, being its own construction of its legislative act, unless it came in conflict with the constitutional laws or treaties of the United States. The record shows that the courts of Cuba have not interpreted the statute."

As to the foregoing, it may be said:

First, there was no question growing out of a treaty involved in the Elmendorf v. Taylor Case, supra, and the rule there announced was applied to the construction by the state court of Kentucky of a Kentucky statute.

Second, the record does not disclose whether the laws of Cuba, in fact, provide for any court review of questions such as that here presented. We have quoted, supra, from the decree of the Secretary of the Treasury the provision that appeals by parties affected by the Cuban act should be heard by what appears to have been an administrative body. We further note that in a document placed in evidence as Exhibit B–2, entitled "Customs Tariff of the Republic of Cuba General Regulations," effective October 19, 1927, etc., there is a provision reading: "There will be no recourse whatsoever granted against the decisions of the office of the Secretary of Finance as regards the return of these duties."

However, whatever the situation may be with respect to the judicial practice in Cuba, we do not agree that only a decision by a Cuban court should be accepted as a controlling interpretation. In the case of United States v. F. S. Allenby & Co. et al., 20 C.C.P.A., Customs, 80, T.D. 45703, this court, citing United States v. Philbrick, 120 U.S. 52, 7 S.Ct. 413, 30 L.Ed. 559, and Slater v. Mexican National Railroad Co., 194 U.S. 120, 130, 24 S.Ct. 581, 48 L.Ed. 900, accepted and applied the interpretation of a Japanese internal consumption-tax law as that interpretation was shown by the practice thereunder testified to by witnesses. We did not have before us there any decision by any Japanese court, nor any order by the executive authority of Japan, but merely testimony of competent witnesses as to the practice in Japan. Here we have the official construction of a Cuban internal consumption-tax law by the executive department of Cuba with uncontradicted evidence of the practice thereunder in Cuba and uncontradicted evidence that such practice has never been questioned in the Cuban courts.

Section 311 of the Tariff Act of 1930, supra, introduced a new element into our customs system. In the final analysis, the provision was intended to afford a certain degree of protection to wheat grown in the

United States, when processed into flour and exported to Cuba, as against wheat imported from other countries.[3]

██ Since the Cuban Government itself has construed its own law in the light of the treaty, as it affects its own internal affairs, that construction should be accepted as to the issue here involved. When so accepted, we are of the opinion that the levy of the additional duty here complained of was required.

It follows, therefore, that the judgment of the United States Customs Court must be and the same is reversed.

---

[3] The section appeared for the first time in the bill which became the Tariff Act of 1930, as that bill passed the House of Representatives. 71 Cong.Record, p. 2100. The Senate Committee on Finance recommended that it be eliminated, saying (Sen.Report No. 37, 71 Cong., 1st Sess., p. 61):

At present foreign wheat may be imported into the United States without the payment of duty, milled in bonded warehouses, and the flour exported, American millers are thereby enabled to mill Canadian wheat for the Cuban trade and to obtain the treaty preferential rate of duty into Cuba, with the natural result that the greater part of the flour sold in Cuba is of this class. Acting apparently upon the plea of the so-called southwestern millers, who are unable to carry on this trade to advantage largely because of transportation costs on the imported wheat, and certain of the wheat growers of the United States, the House inserted in this section a provision designed to prevent American millers of Canadian wheat from obtaining the benefit of the Cuban preferential rate of flour.

\* \* \* \* \* \*

Your committee feels that the House amendment to the existing law would result in little or no benefit to any American farmers or millers and in very considerable harm to many millers. In the bill as reported it has, therefore, been eliminated.

Notwithstanding the recommendation of the Senate Committee, however, the section was retained by the Senate. 71 Cong.Rec., Part 4, pp. 3760–3780, 3801–3806.